RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0364p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA *ex rel.*,

                *Plaintiff - Appellee,*

SEAN BLEDSOE,

           *Plaintiff/Relator - Appellant,*

     *v.*

COMMUNITY HEALTH SYSTEMS, INC., SPARTA
HOSPITAL CORP., d/b/a WHITE COUNTY COMMUNITY
HOSPITAL,

              *Defendants - Appellees.*

No. 06-5096

---

Appeal from the United States District Court
for the Middle District of Tennessee at Cookeville.
No. 00-00083—William J. Haynes, District Judge.

Argued: April 10, 2007

Decided and Filed: September 6, 2007

Before: MOORE and CLAY, Circuit Judges; LAWSON, District Judge.[*]

---

### COUNSEL

**ARGUED:** Mike Bothwell, BOTHWELL & SIMPSON, Roswell, Georgia, for Appellant. Michael L. Waldman, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, Washington, D.C., Steve Frank, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees **ON BRIEF:** Mike Bothwell, BOTHWELL & SIMPSON, Roswell, Georgia, for Appellant. Michael L. Waldman, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, Washington, D.C., Steve Frank, Douglas N. Letter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., John R. Jacobson, BOWEN RILEY WARNOCK & JACOBSON, Nashville, Tennessee, for Appellees.

---

[*] The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

---

**OPINION**

---

CLAY, Circuit Judge.  In his second trip before this Court, Relator Sean Bledsoe appeals the district court's grant of Defendants Community Health Systems, Inc.'s ("CHS") and Sparta Hospital Corp.'s, d/b/a White County Community Hospital ("White County") motions to dismiss his second amended complaint.  Relator also appeals the district court's denial of his motion to recognize a settlement agreement (the "Settlement Agreement") between CHS and the government.  Relator brought this action under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, alleging that Defendants engaged in various types of fraud that increased the reimbursements that they received from Medicare and Medicaid.  In the separate Settlement Agreement, CHS paid $30,494,749.51 to the United States government in settlement of claims that arguably overlap with Relator's complaint; Relator contends that he is entitled to a relator's share of the proceeds.

On appeal, Relator argues (1) that the district court erred in concluding that portions of his second amended complaint were not pled with particularity as required by Federal Rule of Civil Procedure 9(b); (2) that the district court erred in dismissing portions of his second amended complaint as barred by the statute of limitations; (3) that the district court erred in dismissing his entire second amended complaint with prejudice, and without explanation, after previously upholding portions of the complaint; and (4) that the district court erred in denying his motion to recognize the settlement.  For the reasons that follow, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for proceedings consistent with this opinion.

**BACKGROUND**

This is the second time that this case has come before this panel.  Our prior opinion, *United States ex rel. Bledsoe v. Community Health Systems*, 342 F.3d 634, 637-40 (6th Cir. 2003) ("*Bledsoe I*"), explicates the factual background of this litigation in detail.  Here, we recount only the facts that are salient to the issues raised in this appeal.

From April of 1995 to July of 1999, Relator worked as a respiratory staff therapist in White County, which is one of several hospitals owned by CHS.  While working at White County, Relator "became aware of a serious problem with upcoding and other billing irregularities." *Bledsoe I*, 342 F.3d at 637.  Relator allegedly started "cross-referencing patient bills, master charge sheets, and annual department revenues," and he came across "illegal and fraudulent billing practices." J.A. at 107.  Relator reported these irregularities to the government.  Specifically, during 1996 and 1997, Relator was in weekly communication with Jennifer King, an evaluator with the Office of the Inspector General of the Department of Health and Human Services ("OIG-HHS"). *United States ex rel. Bledsoe v. Cmty. Health Servs.*, No 2:00-CV-0083, 2005 WL 3434378, at *5 (M.D. Tenn. Dec. 13, 2005) (unpublished) ("*Bledsoe II*").  King contacted her supervisor at OIG-HHS, who informed her that OIG-HHS would not take the case without substantial evidence. *Id.* at *6.  King referred Relator to the Tennessee Medicare and Medicaid Fraud Control Unit and considered the matter closed. *Id.*  Relator contacted an investigator with the Tennessee Medicare and Medicaid Fraud Control Unit, who informed Relator about the possibility of filing a *qui tam* action.

Relator filed his original complaint in this case in February of 1998.  The complaint pled two causes of action under the False Claims Act ("FCA"):  that Defendants[1] had knowingly presented,

---

[1]The original complaint named CHS as a defendant, but did not name Sparta Hospital Corp.  Additionally, the original complaint named several other defendants who are no longer parties to this case.

or caused to be presented, false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1), and that Defendants had conspired to defraud the government by submitting false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(3). Relator alleged that CHS had "engaged in a scheme of defrauding the United States Government by miscoding and upcoding items billed to Medicare and Medicaid,"[2] and that all Defendants had "engaged in other improper and illegal acts causing false claims to be filed with Medicare and Medicaid." J.A. at 31. Relator filed his complaint under seal, and submitted a written disclosure statement, as required by 31 U.S.C. § 3730(b)(2).[3] Relator's disclosure statement stated that he had witnessed first-hand, or learned about from others, the following fraudulent practices:

> [1] upcoding of contract services and disposable equipment, as well as fraudulent inflation of cost reports, in White County Hospital's nursing and respiratory departments; [2] misuse of a doctor's medical provider number in the emergency room; [3] double billing and billing for unbillable items; [4] improper changing of patients' statuses from an outpatient/observation status to an inpatient status; [5] billing for fictitious continuous heart monitoring; and [6] improperly premature discharging of hospital patients when Medicare reimbursement eligibility had been exhausted.

*Bledsoe I*, 342 F.3d at 638.[4] The United States declined to intervene in Relator's action, see 31 U.S.C. § 3730(b)(4)(B), and Relator served the complaint on the named Defendants in May of 1999.

On at least two occasions after Relator filed his complaint, Relator met with Special Agent Derrick Jackson, an investigator with OIG-HHS, to discuss Relator's allegations. Relator met with Jackson and a number of other government representatives on June 1, 1998. *Bledsoe II*, 2005 WL 3434378, at *6. Relator met again with a number of government officials, including Jackson, on August 4, 1998. *Id.* at *7. On the latter occasion, Relator was accompanied by his fiancé Cindy Peck, now Cindy Bledsoe. Relator's version of the events that took place at the August 4, 1998 meeting differs from Jackson's recollection. Relator contends that he provided Jackson with information relevant to "DRG upcoding."[5] Specifically, Relator claims that he provided Jackson with information pertaining to DRG code 079, a DRG code concerning pneumonia, which, as

---

[2] "'Upcoding,' a common form of Medicare fraud, is the practice of billing Medicare for medical services or equipment designated under a code that is more expensive than what a patient actually needed or was provided." *Bledsoe I*, 342 F.3d at 637 n.3 (citing Bonnie Schreiber et al., *Health Care Fraud*, 39 Am. Crim. L. Rev. 707, 750 n.331 (2002)).

[3] Section 3730(b)(2) states:

A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

[4] Relator's disclosure statement also alleged that Relator had information concerning the unbundling of services at Cookville Regional Medical Center, a not for profit corporation that is no longer a party to this action. "'Unbundling' occurs when a health provider, who initially issues a service as one package, breaks down the service into component parts and finds individual reimbursement codes for those components, so long as the individual rates combined exceed the global rate." *Bledsoe I*, 342 F.3d at 638 n.4 (citing Schreiber et al., *supra*, at 750 n.331).

[5] "DRG" stands for "diagnostic-related group;" DRG codes are used by the Center for Medicare and Medicaid Services to "establish[] a classification of inpatient hospital discharges." *See* 42 C.F.R. § 412.60. Medicare's and Medicaid's reimbursement to hospitals is based in part on DRG codes.

discussed below, is the subject of the government's Settlement Agreement with CHS.  Jackson claims that Relator "did not describe conduct by anyone associated with White County Hospital whereby they were misrepresenting or miscoding patient diagnos[es]."  *Id.* at *7.  Jackson also separately interviewed Cindy Peck on August 4, 1998, outside of Relator's presence.  Peck agreed to meet with Jackson to support Relator's case.  Peck stated that she provided information related to DRG upcoding to Jackson during this interview.

Meanwhile, in the fall of 1997, the government approached CHS about possible upcoding at two of CHS's hospitals.  On December 18, 1997, CHS met with an OIG-HHS inspector and disclosed that it had detected coding irregularities at its hospitals.  CHS and OIG-HHS agreed that CHS would undertake a self-conducted audit, the results of which were presented to OIG-HHS in December of 1998.  During the same time frame, OIG-HHS also worked with the Department of Justice to investigate the circumstances surrounding the coding irregularities at CHS's hospitals to determine whether FCA violations had occurred.  This investigation concluded in the middle of 1999.  Relator was unaware of the investigation during its pendency.

OIG-HHS and CHS eventually entered into the Settlement Agreement.  On or about March 28, 2000, a revised version of the Settlement Agreement was executed.  The agreement provided that CHS was to pay to the United States $30,494,749.51; in exchange the United States, several participating states, OIG-HHS, and Tricare Management Activity agreed to release CHS from any civil and administrative monetary claims arising out of the "Covered Conduct" for the time period specified for each facility listed in Attachment A of the Settlement Agreement.  The Settlement Agreement defined "Covered Conduct" to include the "covered DRGs," which it defined as "the following DRGs: 014, 079, 087, 132, 138, 296, 416, and 475."[6]  J.A. at 626.  Attachment A stated that, for White County Community Hospital, the covered time period extended from October 1, 1994 to December 31, 1997.  The Settlement Agreement also provided that Relator's claims were specifically excluded from the Settlement Agreement.

Relator filed his first amended complaint (the "FAC") on July 3, 2000.  The FAC added White County as a defendant, removed some defendants, and contained new allegations of fraud.  The FAC alleged (1) that Defendants had committed various types of fraud in the psychiatric unit of White County and other CHS subsidiaries; (2) that Defendants employed a new management company that billed Medicare and Medicaid for professional fees under the provider number of a physician who had not in fact provided the professional services; (3) that White County billed Medicare and Medicaid for continuous monitoring by telemetry that did not in fact meet the applicable criteria to be so billed; and (4) that Defendants had engaged in other fraudulent acts, "including but not limited to paying providers bonuses based on admissions, misrepresenting whether certain physicians recruited for an underserved area were full-time employees of the

---

[6]The Settlement Agreement defined "Covered Conduct" as:

> The United States contends that it has certain civil claims against CHS under the False Claims Act, 31 U.S.C. §§ 3729-3733, and other federal statutes and/or common law doctrines as more specifically identified in Paragraph 5 below, for engaging in the following alleged conduct:  the CHS hospitals listed on Attachment A, for the time periods described in Attachment A, submitted or caused to be submitted to Medicare, Medicaid, and TRICARE claims for certain ICD-9-CM diagnosis codes for inpatient admissions grouping to the covered DRGs that were not supported by the patients' medical records and as a consequence received greater reimbursement than that to which the hospitals were otherwise entitled for those admissions (hereinafter referred to as the "Covered Conduct").  The Covered Conduct refers only to those hospitals listed in Attachment A for the time periods described therein.

J.A. at 627.

hospital in order to obtain federal funds, . . . unbundling of services . . . , and similar practices." J.A. at 44-45. The FAC no longer alleged that Defendants had engaged in upcoding or miscoding.

On July 24, 2000, Defendants filed separate answers to the FAC. On November 3, 2000, Defendants filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). On January 16, 2001, Relator moved the district court to recognize the Settlement Agreement, arguing that he was entitled to a percentage of the proceeds under the FCA, 31 U.S.C. §§ 3730(b) and (c). On September 18, 2001, the district court issued a memorandum opinion denying Relator's motion to recognize settlement, granting Defendants' 12(c) motion, and dismissing Relator's suit with prejudice. The district court held that Relator was not entitled to any of the settlement proceeds because the government had declined to intervene in Relator's suit, but instead had pursued settlement negotiations. The district court also concluded that FCA claims constituted "averments of fraud" for the purpose of Federal Rule of Civil Procedure 9(b), and that Relator's complaint was deficient because it did not plead fraud with particularity as required by the Rule. The district court determined that Relator's claims should be dismissed with prejudice because Relator had enjoyed sufficient time in which he could have amended his complaint. On October 16, 2001, Relator filed a timely notice of appeal.

This Court handed down its decision in *Bledsoe I* on September 10, 2003. *Bledsoe I* held that violations of the FCA must comply with Rule 9(b), and that the allegations in Relator's FAC failed to meet this standard. 342 F.3d at 642-44. *Bledsoe I* concluded, however, that the district court abused its discretion by dismissing Relator's complaint with prejudice, because the issue of whether FCA violations must comply with Rule 9(b) was unsettled at the time that Relator had filed his prior complaints, and Relator's disclosure statement indicated that Relator possessed additional information that could potentially allow him to allege FCA violations with sufficient particularity. *Id.* at 645. *Bledsoe I* also held that the government's Settlement Agreement could constitute an "alternate remedy" for the purpose of 31 U.S.C. § 3730(c)(5), and therefore the fact that the government had pursued settlement negotiations, as opposed to intervening in Relator's suit, did not foreclose the possibility of Relator's recovery as a matter of law. *Id.* at 647. The Court concluded, however, that the breadth of the allegations in Relator's complaint prevented the Court from determining whether Relator's allegations overlapped with the Settlement Agreement. Consequently, the Court could not decide whether Relator was entitled to a share of the settlement proceeds on the record before it. *Bledsoe I* instead held that Relator must provide "concrete evidence that he apprised the government of Defendants' DRG coding violations" before he could recover any portion of the settlement proceeds.[7] *Id.* at 651.

Relator filed his second amended complaint ("SAC") on May 18, 2004.[8] The SAC alleged that Defendants engaged in various types of fraudulent conduct.[9] On July 19, 2004, the United

---

[7] *Bledsoe I* also held that the Court lacked subject matter jurisdiction over certain allegations in Relator's FAC because the allegations were based on publicly-disclosed information of which Relator was not the original source. 342 F.3d at 646; *see* 31 U.S.C. § 3730(e)(4)(A). This holding has no bearing upon the instant appeal.

[8] On May 28, 2004, Defendants moved to strike Relator's notice of filing his SAC, claiming that the SAC required the signature of local counsel. On June 22, 2004, Relator refiled his SAC. Relator moved the district court to recognize the filing of the SAC on July 12, 2004, and the district court granted Relator's motion on July 14, 2004. The actual date on which Relator perfected the filing of his complaint is of no consequence to this appeal.

[9] Relator alleged that Defendants had committed the following types of fraud: (1) billing Medicare and Medicaid for professional services under the provider number of a physician who had not provided those services; (2) billing Medicare and Medicaid for continuous monitoring of patients by telemetry that did not in fact occur; (3) billing Medicare and Medicaid for various items that cannot lawfully be separately billed, such as syringes, linens, and ice bags or heating pads; (4) improperly billing Medicaid and Medicare for a "universal setup charge" and for vital sign

States filed a motion for judgment on Relator's claim that he was entitled to a portion of the proceeds of the Settlement Agreement. On July 30, 2004, Defendants separately filed renewed motions to dismiss Relator's SAC. On January 6, 2005, the district court issued a detailed memorandum opinion and order. The district court denied the United States's motion for judgment on Relator's share of the Settlement Agreement without prejudice to renew pending the resolution of an evidentiary hearing. The district court also granted in part and denied in part Defendants' motions to dismiss. The district court closely scrutinized the allegations in Relator's SAC, and arrived at four holdings: (1) several allegations in Relator's SAC should be dismissed for failure to comply with Federal Rule of Civil Procedure 9(b); (2) of the allegations that survived Rule 9(b) scrutiny, some allegations should be dismissed as time-barred under the FCA's statute of limitations, 31 U.S.C. § 3731(b)(1), because they allegedly occurred more than six years before the date that Relator filed his SAC, the allegations did not relate back to Relator's FAC, and Relator was not entitled to statutory or equitable tolling; (3) Defendants' motions to dismiss with respect to Relator's allegations that arguably overlapped with the Settlement Agreement should be dismissed without prejudice to renew pending the outcome of the evidentiary hearing; and (4) Defendants' motions to dismiss were otherwise denied.

On September 8, 2005, the district court held an evidentiary hearing, having determined that it was required to do so by *Bledsoe I*. The district court issued a memorandum opinion stating its findings of fact and conclusions of law on December 13, 2005. After recounting the terms of the Settlement Agreement and Relator's interactions with King and Jackson of OIG-HHS, as discussed above, the district court concluded that Relator could not recover any share of the settlement proceeds. The district court noted that the investigations of both Jackson and King were eventually closed. The district court also refused to consider any evidence from Peck's meeting with the government on the ground that Relator was not an "original source" of the information Peck provided. *Bledsoe II*, 2005 WL 3434378, at *7. The district court then concluded, as a matter of law, that "Relator's evidence does not support a finding that Relator's disclosures led, in any way, to the settlement agreement entered into between the government and CHS." *Id.* at *8. Without further analysis, the district court dismissed Relator's entire action with prejudice. On January 9, 2006, Relator filed a timely notice of appeal.

## ANALYSIS

This appeal presents two essential questions. First, we must determine whether the district court properly dismissed Relator's SAC. Second, we must decide whether the district court properly denied Relator's motion to recognize settlement.

### I.

---

monitors; (5) various instances of miscoding and upcoding CPT codes ("CPT" codes are part of a coding system known as the Current Procedural Terminology coding system) and DRG codes, including (i) billing subsequent respiratory procedures at the higher rate of reimbursement intended for initial procedures, (ii) improperly billing certain supplies as procedures under several CPT codes, (iii) unbundling respiratory services, such as "manipulation of the chest wall" and "postural drainage," with the effect that services that should have been included under a single bill were billed twice, (iv) billing Medicare and Medicaid for equipment that was present in a patient's room, but not in use, (v) billing Medicare and Medicaid for non-existent procedures, (vi) improperly using a CPT code intended to cover the evaluation or management of a new patient to bill Medicare and Medicaid for supplies, minor procedures, and procedures billed under a separate CPT code, (vii) unbundling charges for resuscitation, (viii) adding unsupported diagnosis codes to the principal diagnosis code to increase Defendants' reimbursement, and (ix) using DRG code 79, which is for a more severe form of bacterial pneumonia, when DRG code 89 was appropriate, which is for the more common form of viral pneumonia; (6) billing for unbillable items and procedures, unbundling charges, and double billing for laboratory tests; and (7) submitting cost reports with inflated costs to Medicare, which led to increased reimbursement.

The question of whether we should affirm the district court's dismissal of Relator's complaint subdivides into three component questions. First, we must ask whether all or part of Relator's SAC fails to comply with the pleading requirements of Federal Rules of Civil Procedure 8 and 9(b). Next, we must inquire as to whether the allegations in Relator's SAC are barred by the statute of limitations. Finally, we must determine whether the district court properly dismissed Relator's entire SAC in its December 13, 2005 order notwithstanding the fact that it had previously refused to dismiss certain allegations in Relator's SAC in its order of January 6, 2005.

## A.     Rule 9(b) Compliance

This Court reviews "*de novo* a district court's dismissal of a complaint for failure to state a claim, including dismissal for failure to plead with particularity under [Federal Rule of Civil Procedure] 9(b)." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876 (6th Cir.) (citing *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003)), *cert. denied*, 127 S. Ct. 303 (2006). On a motion to dismiss, the Court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). Under general pleading standards, the facts alleged in the complaint need not be detailed, although "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Id.* at 1964-65 (alteration in original).

*Bledsoe I* sets forth the elements of Relator's cause of action:[10]

> The FCA, 31 U.S.C. § 3729 *et seq.*, is an anti-fraud statute that prohibits the knowing submission of false or fraudulent claims to the federal government. Specifically, § 3729 imposes liability when (1) a person presents, or causes to be presented, a claim for payment or approval; (2) the claim is false or fraudulent; and (3) the person's acts are undertaken "knowingly," i.e., with actual knowledge of the information, or with deliberate ignorance or reckless disregard for the truth or falsity of the claim. *Id.* § 3729(a)(1), (b). . . . Persons who violate the FCA are liable for civil penalties and double or treble damages, plus the costs incurred in bringing a FCA lawsuit. *Id.* § 3729(a).

342 F.3d at 640.

The district court dismissed several allegations in Relator's SAC pursuant to Federal Rule of Civil Procedure 12(c) on the ground that portions of the complaint failed to state FCA violations with particularity, as required by Federal Rule of Civil Procedure 9(b). *See id* at 641 (citing *Yuhasz*, 341 F.3d at 562-63) (holding that FCA claims must comply with Rule 9(b)). Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

Rule 9(b) is not to be read in isolation, but is to be interpreted in conjunction with Federal Rule of Civil Procedure 8. *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir.

---

[10]Relator's SAC contained a second count, which alleged that Defendants "conspired with each other and others to defraud the government by acting collectively to submit or cause to be submitted false and fraudulent claims for payment to the United States in violation of 31 U.S.C. § 3729(a)(3)." J.A. at 253. The district court dismissed this count, holding that Relator had not adequately alleged the existence of an agreement between CHS and White County. Relator does not challenge this determination on appeal.

1988) ("[T]he two rules must be read in harmony."). Rule 8 requires only "a short and plain statement of the claim" made by "simple, concise, and direct allegations." *Id.* Rule 8 is commonly understood to embody a regime of "notice pleading" where technical pleading requirements are rejected in favor of an approach designed to reach the merits of an action. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) ("The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim."). When read against the backdrop of Rule 8, it is clear that the purpose of Rule 9 is not to reintroduce formalities to pleading, but is instead to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct. *See Michaels Bldg. Co.*, 848 F.2d at 679 ("[T]he purpose undergirding the particularity requirement of Rule 9(b) is to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading."); *see also Sanderson*, 447 F.3d at 877 (dismissal was appropriate under 12(b)(6) where the complaint contained "no specific information about the filing of the claims themselves–nothing, that is, to alert the defendants 'to the precise misconduct with which they are charged and to protect defendants against spurious charges of immoral and fraudulent behavior'" (brackets removed) (quoting *United States ex. rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2001))).[11]

> In our prior opinion, we addressed the requirements of Rule 9(b):
>
> In complying with Rule 9(b), a plaintiff, at a minimum, must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993) (internal quotation marks and citations omitted); *see also United States ex rel. Branhan v. Mercy Health Sys. of Southwest Ohio*, No. 98-3127, 1999 WL 618018, at *1 (6th Cir. Aug. 5, 1999) (affirming dismissal of a complaint alleging improper billing in violation of the FCA because it "failed to allege a single specific incident in which improper billing occurred and the plaintiff never set forth the dates, times, or the names of individuals who engaged in the alleged improper billing"). Essentially, the amended complaint should provide fair notice to Defendants and enable them to "prepare an informed pleading responsive to the specific allegations of fraud." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir. 1999) (citing *Michaels Bldg. Co.*, 848 F.2d at 679).

*Bledsoe I*, 342 F.3d at 643. *Bledsoe I* also sheds light upon the contours of Rule 9(b) compliance through its analysis of Relator's FAC. We concluded that Relator's FAC was insufficient under Rule 9(b) because it failed to set forth the dates of various FCA violations, the particulars of the incidents of improper billing, or, with one exception, the names of the individuals involved in the improper billing. *Id.*

Notwithstanding this guidance in *Bledsoe I*, the parties do not agree upon exactly what Rule 9(b) requires in the context of the FCA. The first point of contention is whether Rule 9(b) requires a relator to identify specific false claims with particularity. Relator argues that it is unnecessary that

---

[11]Three justifications are commonly proffered for Rule 9(b)'s heightened pleading standard: it ensures that defendants have the specific notice necessary to prepare a response, it prevents prospective plaintiffs from engaging in fishing expeditions to uncover moral wrongs, and it protects defendants' reputations against damage stemming from accusations of immoral conduct. *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1036 n.25 (4th Cir. 1997) (quoting *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549 (8th Cir. 1997)). *But see* Christopher M. Fairman, *An Invitation to the Rulemakers–Strike Rule 9(b)*, 38 U.C. Davis L. Rev. 281, 291-97 (2004) (arguing that these reasons fail to justify a heightened standard of pleading).

the allegations in his SAC identify *specific false claims*; rather, according to Relator, his complaint is adequate if it instead pleads a *false scheme* with particularity. We disagree with this analysis because it is inconsistent with the FCA and our case law interpreting it. We hold that pleading an actual false claim with particularity is an indispensable element of a complaint that alleges a FCA violation in compliance with Rule 9(b).

A clear and unequivocal requirement that a relator allege specific false claims emerges from the conjunction of Rule 9(b) and the statutory text of the FCA. Rule 9(b) requires that for all "averments of fraud," "the circumstances constituting fraud" must be pled with "particularity," in contrast to the *mens rea* of fraud, which may be pled "generally." Section 3729(a)(1) imposes liability not for defrauding the government generally; it instead only prohibits a narrow species of fraudulent activity: "present[ing], or caus[ing] to be presented, . . . a false or fraudulent claim for payment or approval." *Bledsoe I*, 342 F.3d at 640. The "circumstances constituting fraud" for the purpose of the FCA therefore must include an averment that a false or fraudulent claim for payment or approval has been submitted to the government–or, in the locution of our recent decision of *Sanderson*, "the fraudulent claim is 'the *sine qua non* of a False Claims Act violation.'" 447 F.3d at 878 (quoting *Clausen*, 290 F.3d at 1311); s*ee also United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 235 (1st Cir. 2004) ("[Relator's] failure to identify with particularity any actual false claims that the defendants submitted to the government is, ultimately, fatal to his complaint.").[12]

Our holding in *Bledsoe I* also demonstrates that particularized allegations of an actual false claim is an indispensable element of a FCA violation, and must be specifically pled if a complaint is to survive Rule 9(b) scrutiny. In *Bledsoe I*, we stated that "*at a minimum*," the complaint must "allege the *time, place, and content of the alleged misrepresentation* on which he or she relied." *Bledsoe I*, 342 F.3d at 643 (emphasis added). A relator cannot meet this standard without alleging which specific false claims constitute a violation of the FCA.[13]

---

[12]We do not intend to foreclose the possibility of a court relaxing this rule in circumstances where a relator demonstrates that he cannot allege the specifics of actual false claims that in all likelihood exist, and the reason that the relator cannot produce such allegations is not attributable to the conduct of the relator. For example, in *Hill v. Morehouse Medical Associates, Inc.*, No. 02-14429, 2003 WL 22019936 (11th Cir. Aug. 15, 2003) (unpublished) (per curiam), the relator worked in the billing department of the hospital, she described the alleged fraud in great detail, and she allegedly possessed first-hand knowledge that false claims had been submitted to the government. *Id.* at *4. More importantly, the relator identified specific confidential documents that contained the evidence of false claims, and alleged that those documents were in the exclusive control of the defendant. *Id.*; *accord Sanderson*, 447 F.3d at 878 ("[A]lthough courts have permitted allegations of fraud based upon 'information and belief,' the complaint 'must set forth a factual basis for such belief,' and the allowance of 'this exception must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.'" (internal quotation marks omitted) (quoting *United States ex rel. Thompson v. Columbia/CHA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997))). Because this case does not present such circumstances, we express no opinion as to the contours or existence of any such exception to the general rule that an allegation of an actual false claim is a necessary element of a FCA violation.

[13]Relator's claim that he need only allege a false scheme, rather than specific false claims, is not without some support in the case law. *See, e.g.*, *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1049 (S.D. Tex. 1998) (refusing to dismiss a complaint where the "basic framework, procedures, the nature of fraudulent scheme, and the financial arrangements and inducements among the parties and physicians that give rise to Relator's belief that fraud has occurred have been alleged with specificity"); *United States ex. rel. Pogue v. Am. Healthcorp., Inc.*, 977 F. Supp. 1329, 1333 (M.D. Tenn. 1997) ("Although no specific dates or [any of the defendant's] employees are identified, the complaint alleges that the hospital participated in a systematic fraudulent scheme, spanning the course of twelve years; thus, reference to a time frame and to "[the defendant]" generally is sufficient."). In our view, the analysis of these cases cannot be reconciled with the language of Rule 9(b) and the FCA, or our precedents, and we therefore decline to follow *Pogue*, *Thompson*, or other cases espousing similar reasoning.

Relator argues that *Michaels* requires this Court to take flexible approach to Rule 9(b). Under Relator's view, the Court would not look to the information that was "missing" from a complaint, but would instead "focus on whether the information *contained* in the complaint provides a reasonable basis to make out a cause of action." Relator's Br. at 32 (citing *Michaels Bldg. Co.*, 848 F.2d at 680). Relator ascribes to *Michaels* more weight than the case can bear. *Michaels* did not obviate the need for a plaintiff to specifically allege the essential elements of fraud that constitute a violation of the statute forming the basis of the plaintiff's cause of action. In *Michaels*, the plaintiffs had specifically pled "the parties and the participants to the alleged fraud, the representations made, the nature in which the statements are alleged to be misleading or false, the time, place and content of the representations, the fraudulent scheme, the fraudulent intent of the defendants, reliance on the fraud, and the injury resulting from the fraud," *id.* at 679 (footnote omitted), and there was no evidence that the plaintiffs had failed to plead with specificity a necessary element of their case. *Michaels* is thus distinguishable from cases arising in the FCA context, where a false claim is a requirement of the cause of action.

The parties' next bone of contention is whether, in addition to alleging specific false claims, the parties must plead the identity of the specific individual employees within the defendant corporation who submitted false claims to the government. We reject Defendants' contention that such information is an indispensable part of a complaint that passes muster under Rule 9(b). A requirement that a relator identify specific employees is dissimilar from a requirement that a relator identify specific false claims in every material respect. Such a requirement is not required by the FCA itself or the text of Rule 9(b), nor is it required by *Bledsoe I* or other binding precedents. We therefore hold that while such information is relevant to the inquiry of whether a relator has pled the circumstances constituting fraud with particularity, it is not mandatory.

The identity of the natural person within the corporate defendant who submitted false claims is not an essential element of a FCA violation. The FCA imposes liability on "[a]ny *person* who" "knowingly presents, or causes to be presented, . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a) (emphasis added). For the purpose of the FCA, however, "person" includes not merely natural persons, but also private corporations. *See Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 125 (2003) ("While § 3729 does not define the term 'person,' we have held that its meaning has remained unchanged since the original FCA was passed in 1863. [*Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 783 n.12 (2000).] There is no doubt that the term then extended to corporations . . ."). The offending corporation can therefore be the perpetrator of a FCA violation. Where, as here, the relator has alleged that the corporation has committed the fraudulent acts, it is the identity of the corporation, not the identity of the natural person, that the relator must necessarily plead with particularity.

Nor does *Bledsoe I* include the identity of the natural person who submitted false claims as part of the minima necessary for a valid *qui tam* action. To reiterate, in order to surmount the hurdle of Rule 9(b), a relator's complaint must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Bledsoe I*, 342 F.3d at 643. Notably absent from this list of requirements is the identity of the employee who made the allegedly fraudulent misrepresentation.[14] Finding such a requirement absent from our precedents, we decline Defendants' invitation to engraft a new and formalistic pleading requirement onto the FCA.

---

[14]The standard we set in *Bledsoe I* is binding upon the parties to this appeal under the doctrine of law of the case. The law-of-the-case doctrine dictates that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Patterson v. Haskins*, 470 F.3d 645, 660-61 (6th Cir. 2006) (quoting *Moses v. Bus. Card Express, Inc.*, 929 F.2d 1131, 1137 (6th Cir. 1991)).

Defendants argue that this Court's opinion in *United States ex rel. Branhan v. Mercy Health Systems of Southwest Ohio*, 188 F.3d 510 (table), 1999 WL 618018 (6th Cir. Aug. 5, 1999) (unpublished) compels a different result. True, in *Branhan* the Court stated:

> As part of the Rule 9(b) requirements a person alleging fraud must identify the individuals who participated in the fraudulent scheme. [*Coffey*, 2 F.3d at 161]; *[Hoover v. Langston Equip. Assocs., Inc.*], 958 F.2d 742, 745 (6th Cir. 1992) [(per curiam)]. Even if the [district] court had jurisdiction over plaintiff's False Claims Act claim, the court was correct in dismissing the amended complaint because plaintiff's allegations are based on generalized accusations of wrongdoing attributed to "defendants" without any specificity as to which employees of the defendants were engaged in the alleged fraudulent scheme.

*Id.* at *2.

We refuse, however, to read *Branhan* as establishing a requirement that the identity of employees within a corporate defendant is a necessary element of a FCA violation. As the *Branhan* court concluded that it lacked subject matter jurisdiction to consider the relator's allegations, see *id.*, its conclusion with respect to Rule 9(b) is more properly characterized as dicta than an alternative holding. *See Moreland v. Fed. Bureau of Prisons*, 431 F.3d 180, 185 (5th Cir. 2005) (holding that the conclusion in a prior court's opinion "was dicta because the petition in [the prior opinion] was dismissed for lack of subject-matter jurisdiction" and "was not an alternative holding because it could not support the actual judgment in that case, which was dismissal for lack of subject-matter jurisdiction"), *cert. denied*, 126 S. Ct. 1906 (2006). *Branhan* is also an unpublished case, and is therefore not binding upon this Court. *United States v. Ennenga*, 263 F.3d 499, 504 (6th Cir. 2001) (noting that unpublished decisions are not controlling precedent (citing 6 Cir. R. 28(g)). Undisputedly, then, we are not required to follow *Branhan*; we will defer to *Branhan* only to the extent that its reasoning is persuasive.

The reasoning of *Branhan* is unconvincing. *Branhan* produced no independent reasoning supporting its Rule 9(b) conclusion, but instead relied solely on two cases, *Coffey* and *Hoover*, neither of which supports *Branhan*'s conclusion that the identity of corporate employees must be pled with particularity in order for a relator to comply with Rule 9(b). *Hoover* was a securities fraud case that named numerous entities and individuals as defendants. 958 F.2d at 744. As an alternative holding, the Court held that "plaintiffs had not alleged with specificity who had made the particular misrepresentations and when they were made;" rather, the plaintiffs had only pled "general averments of fraud attributed to 'the defendants.'" *Id.* at 745. The Court concluded that the complaint did not provide the defendants with adequate notice because it did not "enable a particular defendant to determine with what it is charged." *Id.* This reasoning does not support the creation of a requirement that individual employees must be named where, as here, the corporation is the appropriate defendant, and the complaint allows the defendant corporation to determine the false statements that its agents allegedly made. *Coffey* also fails to support *Branhan*'s conclusion with respect to Rule 9(b).[15] In *Coffey*, the fact that the employees of the defendant corporation were not specifically named was merely one fact that was missing from a complaint that was deficient in multiple respects. 2 F.3d at 161. Additionally, the plaintiffs' complaint failed to state the date that

---

[15]We note that *Bledsoe I* reached its holding that a relator must "allege the time, place, and content of the alleged misrepresentations" by relying upon *Coffey*. 2 F.3d at 157. The *Coffey* court elaborated that "[t]he threshold test is whether the complaint places the defendant on 'sufficient notice of the misrepresentation,' allowing the defendants to 'answer, addressing in an informed way plaintiffs [sic] claim of fraud.'" *Id.* (bracketed text in original) (quoting *Brewer v. Monsanto Corp.*, 644 F. Supp. 1267, 1273 (M.D. Tenn. 1986)). *Coffey*'s formulation of the legal test is thus inconsistent with Defendants' reading of *Branhan*.

the allegedly fraudulent statements were made, identify which specific acts or omissions of the defendants amounted to fraudulent conduct, or plead any allegations demonstrating that the plaintiffs relied on the defendants' misrepresentations, which was a necessary element of the tort of fraudulent misrepresentation at issue in *Coffey*. *Id.* at 161-62. Thus, *Coffey* only supports the unremarkable and uncontested proposition that the presence or absence of allegations naming specific employees of a corporate defendant is *relevant* to whether the plaintiff stated the circumstances of fraud with particularity; it does not support the more radical proposition that this information is *necessary* for Rule 9(b) to be satisfied.[16]

To summarize, we hold that a relator bringing an action under the FCA must allege specific false claims with particularity in order to comply with Rule 9(b). However, where the corporation is the defendant in a FCA action, we hold that a relator need not always allege the specific identity of the natural persons within the defendant corporation that submitted the false claims. Instead, such information is merely relevant to the inquiry of whether a relator has pled the circumstances constituting fraud with particularity. A complaint is sufficient under Rule 9(b) if it alleges "the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud," and enables defendants to "prepare an informed pleading responsive to the specific allegations of fraud." *Bledsoe I*, 342 F.3d at 643.

Before applying this standard to Relator's SAC, however, we must address, as a threshold matter, Relator's contention that the district court's "paragraph-by-paragraph application of Rule

---

[16]Defendants contend that "[n]umerous other courts have reached the . . . conclusion that Rule 9(b) *requires* 'the identity and/or role of the individual employee involved in the alleged fraud must be specified in the complaint.'" Defendants' Br. at 22-23 (emphasis added) (quoting *United States ex rel. Robinson v. Northrop Corp.*, 149 F.R.D. 142, 145 (N.D. Ill. 1993)). Defendants, however, exaggerate the support for this position. Most of the cases that Defendants rely upon stand only for the more mundane proposition that this information is relevant, not necessary, to the sufficiency of the complaint. *See Kravelas*, 360 F.3d at 235 (noting that the relator's complaint did not allege specific employees but concluding that the relator's "failure to identify with particularity any actual false claims that the defendants submitted to the government" was "ultimately[] fatal to his complaint"); *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051 (9th Cir. 2001) (dismissing relator's "broad claim[s]" which had no factual support insofar as it did not "specify the types of tests implicated in the alleged fraud, identify the SmithKline employees who performed the tests, or provide any dates, times, or places the tests were conducted"); *United States ex rel. Schwartz v. Coastal Healthcare Group*, No. 99-3105, 2000 WL 1595976, at *6 (10th Cir. Oct. 26, 2000) (unpublished) (holding that the complaint was insufficient where it "merely described the allegedly illegal contracts and arrangements without identifying any person, place, or time when an actual false claim or other illegal activity occurred"); *United States ex rel. Butler v. Magellan Health Servs.*, 74 F. Supp. 2d 1201, 1216 (M.D. Fla. 1999) (complaint did not "adduce specific facts supporting a strong inference of fraud" because it lacked "illustrative instances of fraud" and "only refer[ed] to 'the staff' generally, without identifying any actor, individual or claim"); *United States ex rel. Alexander v. Dyncorp*, 924 F. Supp. 292, 303 (D.D.C. 1996) (requiring the relator to state the "time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud" and noting the relator's failure to identify employees as one of several defects).

Defendants do point to three district court cases that arguably support their contention. Two of these cases arise out of districts located in the Second Circuit, see *United States ex rel. Vallejo v. Investronica, Inc.*, 2 F. Supp. 2d 330, 336 (W.D.N.Y. 1998); *United States ex rel. DeCarlo v. Kiewitt/AFC Enters., Inc.*, 937 F. Supp. 1039, 1049 (S.D.N.Y. 1996), which has embraced a specific Rule 9(b) test in the securities fraud context that the Sixth Circuit has not adopted. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("A Rule 10b-5 plaintiff must comply with Rule 9(b) . . . . Specifically, the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." (citing *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989))). The third case upon which Defendants rely is *Robinson*, but the outcome of that case was arguably influenced by the specific factual context from which it arose. *See Gelco Corp. v. Major Chevrolet, Inc.*, No. 01 C 9719, 2002 WL 31427027, at *9 (N.D. Ill. Oct. 30, 2002) (unpublished) (distinguishing *Robinson* on the basis that "[i]t appears . . . that in *Robinson*, the court most faulted the plaintiffs for failing to plead facts within their actual knowledge"). We decline to follow *Robinson*, *Vallejo*, or *Decarlo* to the extent that they establish a rule that pleading the identity of specific corporate employees is necessary to satisfy Rule 9(b).

9(b) represents an unjustified approach" to analyzing a complaint. Relator's Br. at 35. According to Relator, where a complaint alleges wide-ranging claims of fraud, a court should first ask whether the relator has set forth a "fraudulent scheme;" if a relator has alleged a "fraudulent scheme," then the court should require, at most, that the relator provide some examples of fraudulent conduct.

We start from the proposition that placing allegations of fraud that are insufficient under Rule 9(b) in a complaint alongside allegations that properly state a claim does not affect the legal consequences afforded to the insufficient allegations. That is, if allegations of fraud are insufficient to survive Rule 9(b) scrutiny, the fact that a relator has placed them in the same complaint with separate and unrelated allegations that plead fraud with particularity is irrelevant as a matter of law. There is, quite simply, no legitimate reason for treating insufficient allegations of fraud that are placed in a complaint containing valid allegations differently from insufficient allegations of fraud that occupy their own complaint. Relator does not even attempt to justify such a distinction. This proposition, of course, means that a "paragraph-by-paragraph" approach is not only permissible, but is required, if the paragraphs of a relator's complaint allege separate and unrelated fraudulent conduct.

There are, however, valid reasons for not requiring a relator to plead every specific instance of fraud where the relator's allegations encompass many allegedly false claims over a substantial period of time. *Cf. Clausen*, 290 F.3d at 1312 & n.21 (noting that relator provided no "amounts of charges," "actual dates," "policies about billing," "second-hand information about billing practices," or "cop[ies] of a single bill or payment" and concluding that relator must plead at least "some of this information for at least some of the claims" in order to satisfy Rule 9(b)); *Karvelas*, 360 F.3d at 233 (same). These reasons primarily advance the goal of logistical efficiency. Where the allegations in a relator's complaint are "complex and far-reaching, pleading every instance of fraud would be extremely ungainly, if not impossible." *United States ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co.*, 147 F. Supp. 2d 39, 49 (D. Mass. 2001); *see also In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 333 (D. Conn. 2004) ("[W]here the alleged fraudulent scheme involved numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct."); *cf. United States ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 206-07 (E.D. Tex. 1998) (collecting cases supporting the proposition that "where the fraud allegedly was complex and occurred over a period of time, the requirements of Rule 9(b) are less stringently applied"). For this reason, we hold that where a relator pleads a complex and far-reaching fraudulent scheme with particularity, and provides examples of specific false claims submitted to the government pursuant to that scheme, a relator may proceed to discovery on the entire fraudulent scheme.

The critical question then becomes how broadly or narrowly a court should construe the concept of a fraudulent scheme. If a court were to construe a fraudulent scheme at a high level of generality–for example, if the court concluded that the fraudulent scheme consisted of "the defendant hospital submitting false claims to Medicare or Medicaid"–then the court would, in effect, violate the principle that improperly pled allegations of fraud do not become adequate merely by placing them in the same complaint with allegations that are sufficient under Rule 9(b). Allowing such a complaint to go forward *in toto* would fail to provide defendants with the protections that Rule 9(b) was intended to afford them: Defendants would not have notice of the specific conduct with which they were charged, they would be exposed to fishing expeditions and strike suits, and they would not be protected from "spurious charges of immoral and fraudulent behavior." *Sanderson*, 447 F.3d at 877 (citing *Clausen*, 290 F.3d at 1310); *see Banca Cremi, S.A.*, 132 F.3d at 1036 n.25 (discussing policies furthered by Rule 9(b)). On the other hand, were a court to construe the concept of a fraudulent scheme in an excessively narrow fashion, the policies promoted by the rule allowing a relator to plead examples, rather than every false claim, would be undermined.

We conclude that the concept of a false or fraudulent scheme should be construed as narrowly as is necessary to protect the policies promoted by Rule 9(b). Specifically, we hold that the examples that a relator provides will support more generalized allegations of fraud only to the extent that the relator's examples are *representative samples* of the broader class of claims. *See United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557 (8th Cir. 2006) ("Clearly, neither this court nor Rule 9(b) requires [a relator] to allege specific details of *every* alleged fraudulent claim forming the basis of [the relator's] complaint. However . . . [the relator] must provide *some* representative examples of [the defendants'] alleged fraudulent conduct, specifying the time, place, and content of their acts and the identity of the actors."), *cert. denied* 127 S. Ct. 189 (2006); *Peterson v. Cmty. Gen. Hosp.*, No. 01 C 50356, 2003 WL 262515, at *2 (N.D. Ill. 2003) (unpublished) ("To be clear, the court does not expect relator to list every single patient, claim, or document involved, but he must provide at least some representative examples."); *United States ex rel. Schuhardt v. Wash. Univ.*, 228 F. Supp. 2d 1018, 1034-35 (D. Mo. 2002) ("[A] relator 'must provide some representative samples of the fraud which detail the specifics of who, where and when.'" (quoting *United States ex rel. Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 1997 U.S. Dist. LEXIS 21402 at *33 (D. Minn. Mar. 3, 1997) (unpublished))). In order for a relator to proceed to discovery on a fraudulent scheme, the claims that are pled with specificity must be "characteristic example[s]" that are "illustrative of [the] class" of all claims covered by the fraudulent scheme. Webster's Third New International Dictionary of the English Language Unabridged, 1926 (1993) ("representative" definition 4). The examples of false claims pled with specificity should, in all material respects, including general time frame, substantive content, and relation to the allegedly fraudulent scheme, be such that a materially similar set of claims could have been produced with a reasonable probability by a random draw from the total pool of all claims.[17] With this condition satisfied, the defendant will, in all likelihood, be able to infer with reasonable accuracy the precise claims at issue by examining the relator's representative samples, thereby striking an appropriate balance between affording the defendant the protections that Rule 9(b) was intended to provide and allowing relators to pursue complex and far-reaching fraudulent schemes without being subjected to onerous pleading requirements.

With these principles in mind, we at last turn to Relator's specific allegations in his SAC.[18] The district court dismissed several allegations of fraud in Relator's SAC, specifically: allegations that Defendants fraudulently used incorrect provider numbers, allegations that Defendants fraudulently billed for glucometer finger sticks and heel sticks, allegations that Defendants submitted fraudulent cost reports, and certain allegations that Defendants upcoded and miscoded CPT and DRG codes. These allegations are each addressed below.

***1. Fraudulent Use of Provider Numbers.*** In paragraphs 17 and 18 of the SAC, Relator alleges that Defendants changed emergency room management companies, and as a result, every professional service fee charged by White County for emergency room services was billed under the provider number of a physician who had not performed the services. Relator identifies Dr.

---

[17]This does not imply that *immaterial* differences between the specifically alleged examples and the class of all claims would defeat discovery covering a broader fraudulent scheme. For example, if a relator worked in a defendant hospital's billing department, and all the examples of false claims were culled from the hours when the relator was working, the relator would still be entitled to discovery on a class of claims that included all hours, provided that the relator produced reasons to believe that at all times the hospital billed claims in a similar manner.

[18]The district court concluded many of Relator's allegations survived Rule 9(b) scrutiny. Defendants dispute this conclusion in a summary fashion, arguing that we should dismiss Relator's allegations because Relator failed to name specific, natural persons within Defendants. For the reasons discussed above, we reject this contention, and we restrict our analysis of whether Relator's allegations are pled with particularity to the portions of Relator's complaint that the district court dismissed.

Robert Hoyt as a physician whose provider number was used for this purpose without his consent. Relator also contends that Defendants "submitted numerous bills to Medicare and Medicaid that did not qualify for payment." J.A. at 260.

This basic allegation existed in Relator's FAC. In his SAC, Relator has added several additional details, including the fact that Dr. Hoyt's provider number was involved in the scheme, and that Defendants "submitted numerous bills." In *Bledsoe I*, we dismissed these allegations in Relator's FAC, reasoning that the "complaint failed to set forth dates as to the various FCA violations or any particulars as to the incidents of improper billing Relator supposedly witnessed first-hand." 342 F.3d at 634. We also noted that the complaint did not set forth any of the names of the individuals involved.

The district court analyzed this claim in detail, and concluded that it was deficiently pled because "Relator [did] not identify any allegedly false claims or their submission to the Government, which employees of Defendants allegedly misused Dr. Hoyt's number, or whether such employees worked for CHS, White County, or White County's 'new management company.'" J.A. at 392. We affirm the judgment of the district court with respect to these paragraphs of Relator's complaint. Like Relator's FAC, the SAC remains devoid of any incidents of improper billing that are pled with particularity. This deficiency is fatal to Relator's allegations.

**2. *Fraudulent Billing of Glucometer Finger Sticks and Heel Sticks.*** In paragraph 91 of Relator's SAC, he alleges that "the laboratory" was billing Medicare and Medicaid for glucometer finger sticks and heel sticks as venipunctures, and that such billing constituted fraudulent conduct, as glucometer finger sticks and heel sticks cannot properly be billed to Medicare and Medicaid. Relator asserts that on February 25, 1997, Defendants billed Medicare for 19 venipunctures in addition to 19 "Glucometer Glucose" tests for patient EGH between February 18, 1997 and February 22, 1997. Relator states that, "[u]pon information and belief, the venipunctures billed by CHS and White County were actually finger sticks or heel sticks used to draw blood for the Glucometer Glucose test." J.A. at 297-98.

Relator has failed to state a FCA violation with particularity in paragraph 91 of his SAC. "While fraud may be pled on information and belief when the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge, the plaintiff must still set forth the factual basis for his belief." *United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 454 (5th Cir. 2005) (citing *United States ex rel. Russell v. Epic Healthcare Mgmt. Group*, 193 F.3d 304, 308 (5th Cir. 1999)); *Sanderson*, 447 F.3d at 878. *Cf. Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 489-90 (6th Cir. 1990) (holding that securities fraud churning allegations "cannot be based upon 'information and belief' except where the relevant facts lie exclusively within knowledge and control of the opposing party, and even then, the plaintiff must plead a particular statement of facts upon which his belief is based"). Relator does not provide any information upon which his belief is based, save the fact that 19 venipunctures were billed along with 19 Glucometer Glucose tests, nor does Relator allege that Defendants have exclusive control of the information as to the treatments that were used. Without this information, Relator has failed to allege a specific instance of fraud, and we affirm the district court's dismissal of these allegations.

**3. *Fraudulent Cost Reports*.** Relator's SAC alleges that Medicare reimburses hospitals for additional costs "such as overhead costs, capital improvement costs, and financing costs, among others." J.A. at 298. Relator contends that Defendants inflated the cost reports they submitted to Medicare and "thereby obtain[ed] a greater reimbursement than they were entitled to receive." J.A. at 298. The district court dismissed these allegations because "Relator [did] not mention with any specific information when such cost reports were filed, by whom, and for how much they were inflated." J.A. at 399.

We likewise conclude that these allegations do not meet the pleading requirements of Rule 9(b). The fundamental flaw with Relator's allegations is that they do not provide any specific information about the cost reports allegedly submitted. Absent any information as to when the reports were filed, or for how much they were inflated, Relator has failed to set forth a specific FCA violation. We affirm the district court's dismissal of these paragraphs of the SAC.

***4. Upcoding and Miscoding of CPT and DRG Codes.*** Relator's allegations of DRG and CPT miscoding and upcoding comprise the bulk of his SAC. Allegations of CPT and DRG upcoding or miscoding potentially involve a wide range of conduct. As Relator confirmed in his testimony before the district court, the hospital does not bill for anything that is not covered by a code. We will therefore consider Relator's allegations of upcoding and miscoding on a more particularized basis.

**a. Paragraphs 40-49 of Relator's SAC.** In paragraphs 40-49 of the SAC, Relator alleges a variety of fraudulent activity. Paragraph 40 contends that Defendants submitted false claims under CPT code 94656, which concerns billing for ventilation assist, management and other related activities. Paragraph 41 alleges that the same CPT code was used to bill for the Ven Circuit-7200, which is a disposable piece of plastic tubing which could not properly be billed as a procedure. Paragraph 43 of the SAC states that Defendants billed for "supplies" using CPT code 94640. Paragraph 44 of the SAC alleges that a ventilation procedure was billed under CPT code 94657 on an hourly basis, rather than a daily basis, resulting in overcharges. Paragraphs 45-47 of the SAC allege that Defendants "unbundled"–that is, charged separately for services that should otherwise have been billed jointly–using CPT codes 94667 and 94668. Paragraphs 48-49 of the SAC allege that Defendants billed for equipment that was present in the patient's room, but not in use.

The district court dismissed all these allegations, reasoning that no employee was named as a participant, and that there were no allegations of when such fraud allegedly occurred. We affirm the district court's dismissal of the allegations in paragraphs 40-49. These allegations do not meet the minimum standard of "the time, place and content of the alleged misrepresentation on which [the injured party] relied." *Bledsoe I*, 342 F.3d at 643. There is no allegation that any particular claim was submitted pursuant to these allegedly fraudulent schemes.

Nor are these allegations saved by the allegations of DRG and CPT upcoding and miscoding in Relator's SAC that are pled with particularity. Relator's specific examples of miscoding are: (1) that the CPT code for certain initial respiratory treatments (94664) was used to bill cheaper subsequent treatments (instead of CPT code 94665); (2) that Defendants billed for oxygen and nebulizers, which are supplies, as treatments under CPT code 94664; (3) that Defendants improperly billed for oxygen supplies under CPT code 94779; and (4) that Defendants improperly billed for supplies under CPT code 99201.

These well-pled examples do not notify Defendants as to what specific conduct they are charged with under paragraphs 40-49 of the SAC, because Relator's specific allegations are not characteristic examples illustrative of a class of claims that would include Relator's allegations in paragraphs 40-49. The fraudulent conduct that Relator alleges in paragraphs 44 and 45-47 of the SAC is of a different nature than that pled with particularity. The scheme alleged in paragraph 44 of the SAC involves, to the extent discernible by the complaint, exaggerating the length of a properly-billed treatment; the scheme alleged in paragraphs 45-47 of the SAC involves unbundling. These allegations are materially different from those pled with particularity, which allege that Defendants either billed Medicare and Medicaid for items that are not properly billable, or used an incorrect CPT code to inflate their reimbursement for a properly-billable service.

Relator's allegations in paragraphs 40, 41, and 48-49 of the SAC are closer to the conduct specifically alleged in the complaint insofar as they involves a scheme to bill Medicare and Medicaid for items for which they cannot properly be billed. Nevertheless, we do not consider the allegations to be part of a single, overarching fraudulent scheme. The allegations in paragraphs 40, 41, and 48-49 of the SAC all involve different CPT codes and different items than those at issue in the allegations that Relator pled with particularity. A random sample of claims would not be likely to produce many allegations that Defendants violated the FCA by submitting claims under some CPT codes, *i.e.*, those at issue in the violations pled with specificity, while simultaneously producing no allegations that Defendants violated the FCA by submitting claims under other CPT codes, *i.e.*, those CPT codes at issue in paragraphs 40, 41, and 48-49. Therefore, the allegations pled with particularity are not representative samples of a broader scheme that includes the allegations in paragraphs 40, 41, and 48-49, and the latter allegations must survive Rule 9(b) scrutiny independently of the former. As already discussed, Relator's allegations in paragraphs 40, 41 and 48-49 independently fail to state a claim with particularity as required by Rule 9(b), and must therefore be dismissed.

**b. Paragraphs 52-54 of Relator's SAC.** In paragraphs 52-54 of the SAC, Relator describes a non-existent "call back" procedure that Defendants would fraudulently bill under CPT code 94799. Relator alleges that Defendants required him and other therapists to make a notation of when the therapist that was on call was awakened to respond to an emergency. Relator further contends that charges for this "call back" procedure were fraudulently billed to Medicare or Medicaid in addition to any medical services rendered by the on-call therapist. The district court dismissed these allegations because no employee was named, and because the complaint contained no references to the dates when any allegedly fraudulent activity was observed.

We affirm the district court's dismissal of these allegations. Relator does not identify any specific instance where Medicare or Medicaid was wrongfully billed. Relator's failure to allege false claims with particularity is fatal to these allegations in his SAC.

**c. Paragraphs 65-67 of Relator's SAC.** In paragraphs 65-67 of Relator's SAC, Relator alleges that Defendants "would add other unsupported diagnosis codes to the principal diagnosis code in order to increase the Case Mix Index and obtain a greater reimbursement from Medicare and Medicaid." J.A. at 286. Relator provides one example, that of patient "MAL," who was admitted to White County on December 1, 1997 and received 17 breathing treatments. Relator alleges that MAL was fraudulently given a secondary diagnosis for Tachycardia, an inference Relator draws because MAL was not provided with the expected treatments for a patient suffering from Tachycardia. Relator also notes that MAL's stay at White County was only two days, despite the fact that the national average length of stay for persons with Tachycardia was 5.1 days. Relator alleges that Medicaid was billed for these services on December 9, 1997.

The district court dismissed these charges because Relator did not name specific employees or the "circumstances [indicating] that this was a 'fraudulent scheme.'" J.A. at 397. We disagree, and hold that Relator has sufficiently pled a FCA violation with respect to patient MAL. He has alleged "the time, place and content of the alleged misrepresentation on which [the injured party] relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Id.* Specifically, the time was December 9, 1997, the date of the false claim; on that date White County submitted a bill that fraudulently contained a charge for Tachycardia under DRG code 96; the scheme involved submitting a fraudulent secondary diagnosis in order to receive greater reimbursements. The fraudulent intent can be inferred from the circumstances, and the injury resulting from the fraud is the greater reimbursement paid to White County. Even though Relator has not pled the name of the natural person at White County who submitted the claim, we conclude

that the level of detail contained in the SAC is sufficient to entitle Relator to discovery on his claim that White County submitted false claims with respect to patient MAL.

**d. Paragraphs 64, 68-69, 71, and 80-82 of Relator's SAC.** In paragraphs 64 and 68-69, Relator alleges that Defendants would use DRG code 79 when DRG code 89 was appropriate, the effect of which was to bill for a more serious type of pneumonia than was supportable by the patient's condition. Relator alleges that he reviewed Defendants' files and discovered "numerous cases [in which] the patients had clear chest X-rays and had no documentation in their medical file supporting the pneumonia diagnosis." J.A. at 288. In paragraph 71, Relator claims that he informed Jennifer Collins, of OIG-HHS, that Defendants would improperly bill under DRG code 79. In paragraphs 80-82, Relator supplements his allegations with information he received from Cindy Peck, who was also employed by White County. Peck allegedly reviewed numerous files and discovered DRG miscoding and upcoding with respect to DRG codes 79 and 89, and brought this information to Relator's attention. The district court concluded that these allegations were not pled with adequate specificity because Relator did not allege any specific claims, dates, or employees.

We affirm the district court's dismissal of these allegations. The fact that Relator's SAC lacks specific dates or claims submitted to Medicare or Medicaid compels us to conclude that Relator has failed to state a FCA violation with particularity. Relator's complaint states merely that Relator "reviewed a number of HCFA claims coded with DRG 79, which CHS and White County submitted to Medicare or Medicaid for payment." Conclusory allegations of this sort do not constitute pleading with particularity for the purpose of Rule 9(b). *Sanderson*, 447 F.3d at 877.

**B.      Statute of Limitations**

The next issue before us is whether the district court properly concluded that certain allegations in Relator's SAC were barred by the statute of limitations. The district court dismissed several alleged FCA violations on this ground. The district court reasoned that Relator's SAC was recognized by the district court in July of 2004. The district court then noted that each specific instance of fraud allegedly occurred more than six years before Relator filed his SAC, which is the statute of limitations under the FCA. 31 U.S.C. § 3731(b)(1). The district court proceeded to ask whether Relator's untimely allegations (1) related back to Relator's FAC pursuant to Federal Rule of Civil Procedure 15(c)(2); (2) were statutorily tolled under 31 U.S.C. § 3731(b)(2); or (3) were equitably tolled during the time that the case was pending before this Court. The district court concluded that allegations concerning "fraudulent telemetry monitoring" and "unbundling of fees and kits" did relate back to Relator's FAC. J.A. at 405 (upholding paragraphs 19-22 and 26-27 of the SAC). However, the district court dismissed Relator's claims relating to "non-reimburseable supplies," "fraudulent billing for blood tests," and the surviving claims of upcoding and miscoding of CPT and DRG codes. J.A. at 405 (dismissing paragraphs 23-25; 28-29; 31-32; 34-39; 50-63; and 88-90 of the SAC).

*1. Relation Back.* We review *de novo* the district court's conclusion that allegations in an amended complaint do not relate back to the original complaint. *Miller v. Am. Heavy Lift Shipping*, 231 F.3d 242, 247 (6th Cir. 2000) (citing *Dominguez v. Miller*, 51 F.3d 1502, 1509 (9th Cir. 1995)). Whether new allegations in a complaint relate back to the previous complaint is governed by Federal Rule of Civil Procedure 15(c)(2), which states:

> **(c) Relation Back of Amendments.** An amendment of a pleading relates back to the date of the original pleading when . . . (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.

Rule 15(c)(2) is "based on the notion that once litigation involving particular conduct or a given transaction or occurrence has been instituted, the parties are not entitled to the protection of the statute of limitations against the later assertion by amendment of defenses or claims that arise out of the same conduct, transaction, or occurrence." *Brown v. Shaner*, 172 F.3d 927, 932 (6th Cir. 1997). Rule 15(c)(2) does not define the scope of the terms "conduct, transaction, or occurrence." When applying this standard to the facts of a given case, the Court gives content to those terms not by generic or ideal notions of what constitutes a "conduct, transaction, or occurrence," but instead by asking whether the party asserting the statute of limitations defense had been placed on notice that he could be called to answer for the allegations in the amended pleading. *See Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 573 (7th Cir. 2006) ("The criterion of relation back is whether the original complaint gave the defendant enough notice of the nature and scope of the plaintiff's claim that he shouldn't have been surprised by the amplification of the allegations of the original complaint in the amended one."). The Rule also must be interpreted in light of the "fundamental tenor of the Rules," which "is one of liberality rather than technicality." *Miller*, 231 F.3d at 248.

Relator's original complaint alleged that CHS and related defendants "engaged in a scheme of defrauding the United States Government by miscoding and upcoding items billed to Medicare and Medicaid," J.A. at 31. Relator's FAC alleged that Defendants "engaged in other acts or practices to defraud the United States, including . . . unbundling of services." J.A. at 44-45. Relator contends that, even if these allegations by themselves were too vague to provide Defendants with adequate notice of the nature and scope of the allegations in the SAC, Defendants were placed on notice of the charges by the Disclosure Statement of Sean Bledsoe[19] ("Disclosure Statement"), which was filed with the government as part of Relator's *qui tam* action.

This Court has never squarely addressed the question of whether extrinsic evidence can be considered in determining whether a defendant was on notice of the plaintiff's claims for the purpose of Rule 15(c)(2). Now confronting this issue, we agree with Relator that in this case the Disclosure Statement is relevant to the Rule 15(c)(2) inquiry. We have previously expressed favorable leanings towards allowing courts to consider extrinsic evidence in analyzing whether an amendment relates back to the original complaint. In *Miller*, the Court stated that it was "inclined to believe that notice may be provided by sources outside the pleadings," although the Court decided that it need not rest its holding on that basis. 231 F.3d at 251 n.8 (citing 6A Charles Alan Wright et al., Federal Prac. and Proc. § 1497, at 92-93 (1990 & Supp. 2000); 27A Lawyer's Cooperative Publishing, Federal Procedure: Lawyer's Edition § 62:336, at 127 (1996)). Even the dissent in *Miller*, which would have held that the defendants were not adequately placed on notice and therefore the plaintiffs' amendments did not relate back to their prior pleading, agreed that the inquiry should not be limited to the four corners of the complaint. *Id.* at 252 (Guy, J. dissenting) ("The rationale behind [Rule 15(c)(2)] is to allow relation back when the defendant has been put on notice, through the pleadings *or other sources*, of the entire scope of the transaction or occurrence." (emphasis added) (citing *Barcume v. City of Flint*, 819 F. Supp. 631, 636 (E.D. Mich. 1993))).

Moreover, our opinion in *Bledsoe I* countenanced the idea that Relator would amend his complaint to amplify the allegations in his Disclosure Statement. There, we concluded that Relator's Disclosure Statement was relevant to the related inquiry of whether the district court abused its discretion in denying Relator leave to amend his complaint. We stated that:

> [T]here is some indication from the record that Relator possessed additional information that could have allowed his amended complaint to allege the FCA

---

[19] This statement was served on the government when the lawsuit was first filed, and served on Defendants as part of the Government's Response to Relator's Motion to Recognize Settlement in February of 2001.

violations and other fraud allegations with sufficient particularity, specifically his disclosure to the United States government when he filed his *qui tam* suit. For instance, the district court's opinion noted that Relator failed to name any individuals who engaged in the FCA violations, but in the disclosure filed with the government at the commencement of his *qui tam* suit Relator did provide some names and asserted his possession of supporting documents and additional information.

*Bledsoe I*, 342 F.3d at 645. We would create an anomaly in the law by holding that the Disclosure Statement could inform this Court of the potential for Relator to amend his complaint to comply with Rule 9(b) pursuant to Federal Rule of Civil Procedure Rule 15(a),[20] but to simultaneously conclude that the same document was irrelevant as a matter of law to the Rule 15(c) inquiry.

Finally, restricting the Rule 15(c)(2) analysis strictly to the content of the original pleadings would exalt the form of notice over its substance, and would therefore run counter to the policies underpinning Rule 15. *See Miller*, 231 F.3d at 248. *Cf. Foman v. Davis*, 371 U.S. 178, 181 (1962) (asserting that allowing "decisions on the merits to be avoided on the basis of . . . mere technicalities" is "contrary to the spirit of the Federal Rules of Civil Procedure"). We will instead employ a functional approach to Rule 15(c)(2), and ask whether the allegations in Relator's original complaint and FAC, when construed in light of his Disclosure Statement, allow us to conclude that the allegations in Relator's SAC are part of the same conduct, transaction, or occurrence attempted to be set forth in Relator's earlier pleadings. *See Employees Committed for Justice v. Eastman Kodak Co.*, 407 F. Supp. 2d 423, 440 (W.D.N.Y. 2005) (rejecting the premise that "as a matter of law the requisite notice required under Rule 15 *must* be found in the content of the original pleading"); Wright, Miller, & Kane, *supra* § 1497, at 92-93 (same).

The district court dismissed paragraphs 31-32, 34-39, and 50-63 of the SAC, which concern DRG and CPT upcoding, on the ground that these allegations did not relate back to the original complaint. These allegations concern: (1) failing to differentiate between initial and subsequent respiratory treatments when billing Medicare and Medicaid; (2) improperly billing Medicare and Medicaid for unbillable equipment and supplies; (3) using CPT code 94799 to fraudulently bill Medicare and Medicaid for "02 equipment daily" charges; (4) improperly billing Medicare and Medicaid under CPT code 94799 for a "call back" charge for which no procedure is associated; (5) improperly billing Medicare and Medicaid for supplies or minor procedures under CPT code 99201; (6) improperly billing Medicare and Medicaid for observation care; and (7) improperly double-billing Medicare and Medicaid for cardiopulmonary resuscitation under CPT code 99201 and improperly billing for other procedures unbundled and billed under CPT Code 92950.

We conclude that the above allegations labeled numbers (1), (2), (3), (5) and (6) relate back to Relator's prior pleadings.[21] The allegations of CPT upcoding and miscoding in Relator's original complaint, when read in conjunction with Relator's Disclosure Statement, were adequate to apprise

---

[20]Rule 15(a) states:

**(a) Amendments**. A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders.

[21]This corresponds to the allegations in paragraphs 31-32, 34-39, 50-52, and 55-61 of the SAC.

Defendants of the fraudulent conduct at issue in this litigation, and we hold that the allegations arise out of the same conduct, transaction, or occurrence attempted to be set forth in Relator's prior pleadings. For each of these allegations, Relator's Disclosure Statement provides numerous examples of allegedly upcoded or miscoded charges, and it includes the CPT codes allegedly used to perpetrate the fraud. Defendants should not now be surprised that Relator's SAC alleges these FCA violations.

The same cannot be said, however, for the items labeled number (4) and (7), that is, Relator's allegations of improperly billed "call back" procedures and improperly billed cardiopulmonary resuscitation and other procedures. Relator's original complaint and FAC never mention a "call back" procedure, and the only specific allegations of services billed under CPT code 94799 in Realtor's Disclosure Statement describe the services as "emergency room" or "02 Equip./Daily," neither of which would alert Defendants that a "call back" procedure was at issue. Likewise, while there are several allegations of improper billing under CPT code 99201 contained in the Disclosure Statement, nothing in the original complaint or the FAC would alert Defendants to the fact that cardiopulmonary resuscitation procedures were involved in Relator's prior allegations of fraud. And nothing in Relator's original complaint, FAC, or Disclosure Statement alludes to the other services allegedly unbundled and billed under CPT code 92950. We conclude that these allegations in the SAC do not relate back to either of Relator's earlier complaints.

In paragraphs 88-90, Relator's SAC alleges that the laboratory was unbundling, double billing, and billing for unbillable items. These allegations are also present in Relator's Disclosure Statement, which alleges that "the lab" was "routinely double billing, billing for unbillable items and procedures, and unbundling." J.A. at 109. The Disclosure Statement also refers to the specific CPT codes and procedures that form the basis of the allegations in the SAC. This information, when combined with Relator's general allegations of unbundling, was sufficient to put Defendants on notice as to paragraphs 88-90 of the SAC, and we hold that these paragraphs relate back to the original complaint.

Relator's allegations in paragraphs 23-25 and 28-29 of the SAC do not concern upcoding and miscoding. Instead, Relator alleges in these paragraphs that Defendants fraudulently billed Medicare and Medicaid for equipment and supplies. Nothing in the original complaint, the FAC, or Relator's Disclosure Statement addresses the FCA violations that Relator alleges in these paragraphs. We hold that Relator's allegations in paragraphs 23-25 and 28-29 of the SAC do not arise from the same conduct, transaction or occurrence alleged in the original complaint or the FAC, and therefore do not relate back to Relator's prior pleadings.

*2. Equitable Tolling.* Because we have determined that some of Relator's claims do not relate back to his prior pleadings, we must determine whether the otherwise time-barred allegations are saved by equitable tolling. We conclude that Relator is entitled to equitable tolling of the statute of limitations for the period while *Bledsoe I* was pending on appeal, and therefore his otherwise time-barred allegations are timely. We generally review a district court's decision not to apply equitable tolling for abuse of discretion, but we review the district court's decision *de novo* to the extent that the facts are undisputed. *Dixon v. Gonzales*, 481 F.3d 324, 331 (6th Cir. 2007) (citing *Dunlap v. United States*, 250 F.3d 1001, 1007 n.2 (6th Cir. 2001)). In evaluating an equitable tolling claim, we look to five factors: "(1) lack of actual notice of [the] filing requirement; (2) lack of constructive knowledge of [the] filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) a plaintiff's reasonableness in remaining ignorant of the notice requirement." *Andrews v. Orr*, 851 F.2d 146, 151 (6th Cir. 1988). These factors, however, do not constitute an exhaustive list of factors that the court should consider in determining whether equitable tolling should apply. *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 469 (6th Cir.

2003). Equitable tolling is thus determined on a case-by-case basis. *Id.* (citing *Truitt v. County of Wayne*, 148 F.3d 644, 648 (6th Cir. 1998)).

Relator does not contend that he lacked actual notice or constructive knowledge of the filing requirement, or that he was ignorant of the filing requirement. Relator instead argues that the time between our mandate in *Bledsoe I*, which was issued on November 21, 2003, and the time by which he would have been required to file a timely amended complaint was, as a matter of basic fairness, insufficient for him to file an amended complaint. We agree. Our prior opinion made clear that Relator was entitled to file an amended complaint, and that the record did not evince any "undue delay, bad faith, or dilatory motive on the part of Relator, or any undue prejudice to Defendants by virtue of allowance of the amendment." *Bledsoe I*, 342 F.3d at 645 (internal quotation marks and brackets omitted) (quoting *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002)).

Nevertheless, the district court held that Relator was not entitled to equitable tolling. The district court reasoned that "Relator's *final* specific allegation of fraud occurred on January 6, 1998," J.A. at 407 (emphasis added), and therefore even counting from November 3, 2003, the date that rehearing was denied, the approximately "two-month time period would have been sufficient for Relator to file his Second Amended Complaint." J.A. at 408 n.10. The district court's analysis is perplexing insofar as it focuses on the *latest* date on which any of Relator's allegations of misconduct supposedly occurred. Certainly, the district court could not have expected that Relator would have filed an amended complaint *before* our decision in *Bledsoe I* reversed the district court's dismissal of Relator's FAC with prejudice, though many of the specific allegations in Relator's SAC were already time-barred by September 10, 2003, when *Bledsoe I* was filed. Nevertheless, the district court did not uphold these allegations–instead, it must have reasoned that since *some* of Relator's allegations could still have been timely filed, Relator's failure to rapidly file his SAC meant that *all* allegations contained therein should not be subject to equitable tolling.

Unlike the district court, we start from the proposition that the instances of misconduct in Relator's SAC that allegedly occurred more than six years before the date that our mandate in *Bledsoe I* was issued were entitled to equitable tolling. While many of the alleged instances of misconduct in Relator's SAC allegedly occurred between November 22, 1997–exactly six years before the first day after our mandate that Relator could have filed an SAC containing allegations within the statute of limitations–and January 6, 1998, we will not attempt to draw a line between these two dates that separates the claims that are entitled to equitable tolling from the claims that are not so entitled. Instead, we conclude that all of Relator's claims are entitled to equitable tolling, provided that Relator acted with diligence in pursuing his rights, and that Defendants were not prejudiced by Relator's delay in filing his SAC. The fact that Relator could have salvaged *some* of his claims by filing his SAC within approximately a month-and-a-half of our mandate is irrelevant.

In light of the unique circumstances of this case, where many of Relator's specific allegations were already barred by the statute of limitations at the time when he was granted leave to amend, we conclude that Relator did not act with a lack of diligence by not attempting to file his SAC until May of 2004. Moreover, we can perceive no substantial prejudice to Defendants by Relator's delay of several months. We conclude that all of Relator's claims are entitled to equitable tolling for the period that *Bledsoe I* was pending on appeal, and we therefore consider them to be filed within the FCA's six year statute of limitations.

## C.     Dismissing the Entire Second Amended Complaint

In its opinion of January 6, 2005, the district court granted Defendants' motion to dismiss in part, but also upheld substantial portions of Relator's SAC. In *Bledsoe II*, the district court's discussion of the procedural history of the case reaffirmed this disposition. *Bledsoe II*, 2005 WL

3434378, at \*2 ("Accordingly, Relator's claims for alleged fraudulent billing for continuous monitoring services, unbundling of setup fees, daily fees and components of kits, and DRG upcoding and miscoding for bronchitis and asthma were allowed to proceed." (citations omitted)). Nevertheless, at the conclusion of *Bledsoe II*, the district court dismissed the entire action with prejudice and without further analysis of these claims. *Id.* at \*8.

The district court gave no reason for dismissing Relator's entire SAC, and we likewise can discern no reason justifying a dismissal of the entire action. We accordingly hold that the district court erred in dismissing Relator's entire SAC.[22]

## II.

The second issue in this appeal is whether the district court correctly concluded that Relator was not entitled to recover proceeds paid by CHS pursuant to the Settlement Agreement. As a threshold matter, the government argues that Relator's complaint cannot, as a matter of law, entitle him to a share of the settlement proceeds, because it fails to allege a valid *qui tam* action under Federal Rule of Civil Procedure 9(b) with respect to the miscoding or upcoding of any DRG code covered by the Settlement Agreement. Whether a valid *qui tam* action is a prerequisite to Relator's recovery is a question of law that we review *de novo. Cf. Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488, 492 (6th Cir. 2005) (citing *Pressman v. Franklin Nat'l Bank*, 384 F.3d 182, 185 (6th Cir. 2004)) (legal conclusions of the district court following a bench trial are reviewed *de novo*).

Neither Relator nor the government disputes the fact that DRG code 79 is the only code that is both included in the "Covered Conduct" defined by the Settlement Agreement and also forms a part of the allegations of fraud in Relator's SAC.[23] Because the district court dismissed Relator's allegations with respect to DRG code 79 (and we affirm that dismissal), we must determine whether Relator can nevertheless recover settlement proceeds, even assuming that he could "provide more concrete evidence that he apprised the government of Defendants' DRG coding violations." *Bledsoe I*, 342 F.3d at 651. We addressed this issue in *Bledsoe I*:

> [T]he government asserts that because Relator failed to state a claim with sufficient particularity, as required by Rule 9(b), he would not be entitled to a share of the settlement because his *qui tam* action was invalid. *While it is true that a threshold requirement for a relator's ability to share in the proceeds of a FCA lawsuit is to file*

---

[22]Defendants argue that the district court dismissed Relator's remaining claims for failure to prosecute, in spite of the fact that the district court gave no indication that it was dismissing the complaint for that reason. According to Defendants, Relator's absence of motions or discovery following the January 6, 2005 order until the date of *Bledsoe II* demonstrates that "Relator Bledsoe showed no interest in his surviving allegations." Defendants' Br. at 44. Defendants' argument lacks merit. Since the district court did not exercise its discretion in the first instance, we will not affirm its dismissal on that basis, particularly on this record, which does not clearly demonstrate a failure to prosecute on the part of Relator. *Cf. Stallworth v. Greater Cleveland Reg'l Transit Auth.*, 105 F.3d 252, 258 (6th Cir. 1997) (noting that "the district court should exercise [its] discretion in the first instance," and refusing to consider district court's refusal to grant attorney fees as an exercise of discretion where circumstances indicated that the district court did not consider the matter).

Defendants also argue that we should dismiss the portions of Relator's complaint that were upheld for failure to name specific employees. We reject this contention for the reasons stated above.

[23]Relator asserts that the Settlement Agreement focused on eight particular DRG codes not because they were the only ones being miscoded or upcoded, but instead because those eight codes were the product of negotiations between CHS and the government. Nevertheless, Relator does not contend that there is another code covered by the Settlement Agreement that is also a basis of a false claim alleged in Relator's SAC, or that the Settlement Agreement constitutes satisfaction of claims arising under other DRG codes not included in the "Covered Conduct" as defined by the Settlement Agreement.

*a valid* qui tam *action*, 31 U.S.C. § 3730(b)(1), we already have decided to remand the case to allow Relator to comply with Rule 9(b). Therefore, Relator's prior failures in this regard do not offer a *present* basis for denying his motion.

. . .

Relator is entitled to an opportunity to amend his amended complaint in order to state his FCA claims with sufficient particularity. Fed. R. Civ. P. 9(b). *If the Relator satisfactorily complies with Rule 9(b)'s particularity requirement, . . . the district court will then determine whether the conduct contemplated in the May 8, 2000 settlement agreement overlaps with the conduct alleged by Relator in bringing his* qui tam *action.* For purposes of making this determination, the district court will hold an evidentiary hearing at which Relator and the government may present evidence in support of their positions.

342 F.3d at 650, 651 (emphasis added).

We hold that Relator cannot recover settlement proceeds because he has not alleged a valid *qui tam* action that overlaps in any way with the conduct covered by the Settlement Agreement. This conclusion is required by our decision in *Bledsoe I.* Moreover, it is also consistent with *Bledsoe I*'s rationale for holding that an "'alternate remedy' [for the purpose of 31 U.S.C. § 3730(c)(5)] refers to the government's pursuit of any alternative to intervening in a relator's *qui tam* action." *Id.* at 647. This determination rested in part on the premise that, were an "alternate remedy" construed to allow the government to settle a *qui tam* suit without intervening, then "the government could decline to intervene in a *qui tam* suit, then settle that suit's claims separately and deny the relator his or her share of the settlement proceeds simply because the government had not formally intervened in the *qui tam* action." *Id.* at 648-49. This course of action would undermine relators' incentives to bring *qui tam* actions, and would thereby frustrate Congress's intent that "the government and private citizens collaborate in battling fraudulent claims." *Id.* This reasoning, however, does not extend to *qui tam* actions that fail to adequately state a claim upon which relief can be granted. Since there is no prospect for relators to recover on their claims under any circumstances, holding that a relator is not entitled to settlement proceeds that potentially overlap with his inadequately-pled claims does not decrease relators' incentives to bring *qui tam* actions in the first instance.

Moreover, allowing a relator who failed to plead fraud with particularity to recover proceeds from an alternate remedy pursued by the government with respect to those fraudulent allegations would make little sense. *Qui tam* proceeds are available not to persons who inform the government of wrongdoing, but are only available when the government proceeds "with an action." 31 U.S.C. § 3730(d)(1). Absent a valid complaint which affords a relator the possibility of ultimately recovering damages, there is no compelling reason for allowing a relator to recover for information provided to the government. *See Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 973 (6th Cir. 2005) ("A complaint that fails to provide adequate notice to a defendant can hardly be said to have given the government notice of the essential facts of a fraudulent scheme, and therefore would not enable the government to uncover related frauds."); *United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, —F.3d—, 2007 WL 2034087, at *6 (3d Cir. 2007) ("[A] valid *qui tam* action is a prerequisite to a relator's right to recover." (citing *Donald v. Univ. of Cal. Bd. of Regents*, 329 F.3d 1040 (9th Cir. 2003))).

This Court's decision in *Walburn* reinforces our conclusion. In *Walburn*, the Court considered the analogous issue of whether a complaint that failed to comport with Rule 9(b) could bar another litigant's subsequent complaint that set forth more specific allegations of fraud. *Walburn* held that the prior noncompliant complaint was "legally infirm from its inception" because it did not comport with Rule 9(b), "and therefore it cannot preempt Walburn's action under the

first-to-file bar."**24** *Id.* at 972. Affording similar treatment to the complaint in this case leads to the conclusion that a legally invalid complaint cannot form the basis for recovery.

Relator argues that he has met *Bledsoe I*'s threshold requirement of a valid *quit tam* action, because he has filed a complaint that has survived Rule 9(b) scrutiny. We reject this argument, because in all its iterations it ultimately rests on the faulty premise that general allegations of CPT and DRG upcoding and miscoding–allegations that do not concern the DRG codes covered in the Settlement Agreement–are sufficient to permit Relator to recover for upcoding and miscoding violations related to DRG code 79. Relator makes this argument by referring to the general allegations of DRG and CPT upcoding and miscoding in his SAC, and also by addressing the SAC's more specific allegations related to asthma miscoding under DRG code 96. None of these arguments are persuasive. We implicitly rejected Relator's argument that general allegations of DRG miscoding and upcoding sufficed to permit Relator to recover settlement proceeds in *Bledsoe I*, when we held that the allegation in Relator's original complaint that Defendants had "miscod[ed] and upcod[ed] items billed to Medicare and Medicaid" was too broad to support a finding of overlap. 342 F.3d at 650.

Relator also claims that the SAC's allegations regarding DRG code 96 satisfy the threshold requirement of a valid *qui tam* action. This argument lacks merit. The fact that Relator has stated a valid cause of action with respect to FCA violations that *do not* overlap with the Settlement Agreement is irrelevant to the question of whether the Settlement Agreement constitutes an alternate remedy to Relator's *qui tam* action. There is no persuasive reason for differentiating between Relator, who has filed a *qui tam* action concerning matters unrelated to the allegations covered by the Settlement Agreement, and an individual who informs the government of FCA violations but never files a *qui tam* action at all, the latter of whom undisputedly is not entitled to recover proceeds from a settlement agreement that overlaps with the information he provided to the government. Simply put, a valid *qui tam* action must exist with respect to the FCA violations covered by the Settlement Agreement. Relator cannot meet this standard.

## CONCLUSION

To summarize: We affirm the district court's dismissal of Relator's allegations in his SAC pursuant to Federal Rules of Civil Procedure 12(c) and 9(b), except insofar as the district court dismissed paragraphs 64-67 of the SAC. We reverse the district court's dismissal of paragraphs 64-67 because Relator's allegations in those paragraphs survive Rule 9(b) scrutiny. We also reverse the district court's decision to dismiss any of Relator's allegations on the ground that they were barred by the statute of limitations. Additionally, we reverse the district court's decision to dismiss Relator's entire complaint. On remand, Relator may proceed with all his claims in the SAC, except those dismissed by the district court for failure to comply with Rule 9(b), but Relator may proceed with the allegations in paragraphs 64-67 of the SAC notwithstanding the district court's dismissal of those claims. We affirm on different grounds the district court's denial of Relator's motion to recognize settlement.

For the reasons stated above, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings consistent with this opinion.

---

**24***See* 31 U.S.C. § 3730(b)(5) ("When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.")